Frederick **KIRKPATRICK**, etc.,
**Petitioner-Appellant,**

v.

Frank **BLACKBURN**, Warden, Louisiana
State Penitentiary, et al.,
**Respondents-Appellees.**

No. 85–3029.

United States Court of Appeals,
Fifth Circuit.

Nov. 26, 1985.

Opinion on Denial of Rehearing and
Rehearing En Banc Jan. 16, 1986.

Patrick L. Durusau, Jena, La., Robert L. McGlasson, Atlanta, Ga., for petitioner-appellant.

Joseph E. Kopsa, Asst. Atty. Gen., Baton Rouge, La., Harry H. Howard, Asst. Atty. Gen., New Orleans, La., Margaret A. Coon, Asst. Dist. Atty., Covington, La., for respondents-appellees.

Before GEE, RUBIN and RANDALL, Circuit Judges.

PER CURIAM.

A prisoner condemned to death for first degree murder committed in the course of a robbery and under conditions that the jury found to be especially heinous seeks habeas corpus relief. The district court, 597 F.Supp. 1562, denied the writ but issued a stay of execution and a certificate of probable cause. Having reviewed the record of the trial, the state post-conviction proceedings, and the federal evidentiary hearing with care, we conclude that, as to all issues on which the district court made findings of fact, the findings are supported by the record. Applying settled legal principles to those facts, we affirm. The district court, however, made no findings on the claim that trial counsel had been ineffective because he failed to seek suppression of evidence used at the trial, and we, therefore, remand for further consideration of this issue.

I.

Frederick Kirkpatrick was convicted of first degree murder by a twelve-person Louisiana jury on the following evidence, as summarized by the Louisiana Supreme Court[1] and as reflected in the record. Kirkpatrick and Charles Faulkner, both of whom lived in Mississippi, came to the home of Steve Radoste in the Pearl River area of St. Tammany Parish, on the evening of January 27, 1982, perhaps by hitchhiking a ride with Radoste. During the night, Radoste was killed, his home was robbed, and his truck was stolen. The next day, his battered, nude body was found lying on the floor with a gunshot wound in the right side of his head and a butcher knife stuck to the hilt into his chest. He had another grave knife wound to his abdomen and other wounds to his head. Two blood-stained pillows, each with a bullet hole, lay next to the right side of the victim's head. The coroner found that the gunshot wound caused death, but that the stab wounds would themselves have been fatal within a few hours as a result of slow internal bleeding.

1. *State v. Kirkpatrick,* 443 So.2d 546 (La.1983).

On the afternoon of the same day, the Meridian, Mississippi, Police Department found a burned pickup truck south of the city. Acting on information, they obtained a warrant to arrest Kirkpatrick for arson. The police went to the home of Caroline Wright, where Kirkpatrick was then living, to execute the warrant. When they entered the house to make the arrest, the officers observed two television sets, a wine rack, some leather jackets, and other items.

After being advised of his *Miranda* rights, Kirkpatrick made a statement in which he admitted that he and Charles Faulkner had driven the pickup truck, whose owner had not then been identified, to a remote area near Meridian and that he had watched while the truck was burned. He also stated that Faulkner had a .22 caliber Derringer.

The next day the Meridian police department received a teletype from the St. Tammany Parish, Louisiana, sheriff's office that identified the truck as Radoste's. Deputies from St. Tammany Parish went to Meridian to examine the truck. After the deputies identified the truck, the Meridian police obtained a warrant to search the house at which Kirkpatrick was living. They there found and seized the property described above, which was later identified as belonging to Radoste. Kirkpatrick was then arrested for Radoste's murder.

While the investigation was being made, Faulkner's cousin delivered to the police a .22 caliber Derringer which he said had been given to him by Faulkner. Tests showed that the bullet removed from Radoste's head had been fired from this weapon. Faulkner was later apprehended and charged.

Kirkpatrick was thereafter tried for first degree murder in Louisiana. During the trial, Kirkpatrick took the stand in his own defense and testified that, to the extent he was involved at all in the assault on Radoste, he was acting in self-defense to fend off Radoste's homosexual advances. He testified that Radoste held Faulkner and him at gunpoint, and that he got into a struggle with Radoste to protect his friend and himself. He said he hit Radoste over the head with a glass dish cover, then stabbed the victim twice with a knife that the victim had earlier used in serving his two guests a meal. "When the man fell, the pistol went off," he said. Other witnesses testified that Kirkpatrick had given varying accounts of the events of the night, including telling them at various times that Faulkner had shot Radoste and that Kirkpatrick had "killed" Radoste (without specifying how).

At 7:30 p.m. on Thursday night, following a four-day trial, the jury returned a verdict finding Kirkpatrick guilty of first degree murder. The state judge then proposed to start the sentencing phase of the trial immediately. Just before that proceeding began, Kirkpatrick's lawyer, Thomas Ford, moved for an overnight recess because, he said, five of the six witnesses he wished to call were not present. Ford named the absent persons as Kirkpatrick's foster parents, Annabelle and Arthur Jones; two children of his common-law wife, Billy and Robert Kirkpatrick; and his brother, Eddie Kirkpatrick. All six had been subpoenaed to be present at the start of the trial on Monday. None had arrived.

The court said, "If these witnesses didn't show up for Monday morning at nine-thirty o'clock, a.m., this was the time for us to deal with this particular problem, not at seven forty-five on Thursday evening." Kirkpatrick's lawyer explained that he had not required the witnesses to be present at the beginning of the trial because neither he nor Kirkpatrick could pay their expenses for travel, lodging, and food. "Kirkpatrick talked to them last night and was given all verbal assurances that they would, in fact, be here today. And at this point, they are not here." He stated that he could not assure the court that they would be present the next day if the trial were recessed, saying, "I cannot assure the court of anything. I can merely try." The state trial judge denied a recess and the sentencing phase of the trial began.

The one witness called to testify for Kirkpatrick was Caroline Wright. Ms. Wright said that she and Kirkpatrick had lived together two years and that he had treated her and her children "very good." She testified at some length about his devotion to her children and their love for him. The jury retired to deliberate and, at 10:30 p.m., returned with a recommendation that Kirkpatrick be sentenced to death. The jury found, as the Louisiana statute requires,[2] two aggravating circumstances: the offender was engaged in the commission of an armed or simple robbery at the time of the murder and the offense was committed in an especially heinous, atrocious, or cruel manner.[3]

Kirkpatrick appealed his conviction and it was affirmed.[4] He then sought a writ of habeas corpus in state court, which held an evidentiary hearing on some of the issues. When relief was denied, Kirkpatrick applied for a writ to the federal district court, which, likewise, denied relief. Although the state did not respond and filed no pleadings, the federal district court conscientiously reviewed each of the twenty-four contentions raised by Kirkpatrick's counsel and rendered a 48-page opinion.

Kirkpatrick raises several issues on this appeal. First, Kirkpatrick contends that the trial court's refusal to grant a recess before the sentencing phase of the trial deprived him of a fair trial and reliable sentencing determination, rights granted him by the fourteenth and eighth amendments. Second, Kirkpatrick alleges that the prosecutor's repeated use of "highly prejudicial, irrelevant, arbitrary and non-record assertions" denied Kirkpatrick due process of law because it made the trial fundamentally unfair. Third, Kirkpatrick argues that his trial counsel was ineffective, denying him the fourteenth amendment-sixth amendment right to effective assistance of counsel. Last, Kirkpatrick submits that the trial court's jury instruc-

tion denied him due process of law because it did not require the jury to find before imposing a death sentence that Kirkpatrick killed, intended to kill, or attempted to kill the victim without legal justification as is required in capital cases. We discuss these issues in turn.

## II.

Because the state court record was inadequate for determining whether the trial court's refusal to grant a continuance was an abuse of discretion and a denial of due process, the federal district judge held an evidentiary hearing on this issue. The only evidence presented was the testimony of Kirkpatrick's foster parents, Anabelle and Arthur Jones, and the state court postconviction testimony of his aunt and his twin brother. Ms. Jones testified that Kirkpatrick's trial counsel had communicated with her and her husband and told them to be ready to come to the trial when he telephoned them. If someone had telephoned them and had told them when to come, they would have come to testify with only one day's notice for they lived in Mississippi, only four hours drive from Covington, Louisiana, where the trial was held. Ms. Jones would have testified that Kirkpatrick's parents had been very poor, and that he had not received adequate food, clothing, or education. Kirkpatrick's father had died when Kirkpatrick was nine years old. He and his twin brother had lived with the Joneses from the time the boys were twelve years old, when their mother had died, until they were nineteen. Ms. Jones loved Kirkpatrick. Had she testified at the trial, she would have asked the jury to spare his life.

The district judge observed, however, that Ms. Jones' testimony "evidenced her difficulty in recalling basic facts about her relationship with Kirkpatrick." She remembered that he had been in trouble with

---

**2.** La.Code Crim.P. art. 905.3 (West 1984) (Louisiana requires that a jury find at least one statutory aggravating circumstance before it recommends a sentence of death).

**3.** *See* La.Code Crim.P. art. 905.4 (West 1984) (list of aggravating circumstances).

**4.** *State v. Kirkpatrick,* 443 So.2d 546 (La.1983).

the police three or four times, at least once for stealing, but she was uncertain whether he had ever been arrested. He had visited her about six times since he had left her home, but she was not able to say when the last visit was. She had not visited him after his arrest and had not written to him, nor had he telephoned her or written to her. She had not visited him since his conviction for murder. The court summarized, "[o]n the whole, I did not find her to be a very favorable witness for Kirkpatrick."

Much of Mr. Jones' testimony was to the same effect, but his testimony differed from that of Ms. Jones in some respects that were noted by the district judge. The district judge commented, "Mr. Jones testified with far more confidence, but he contradicted his wife on at least two occasions. He testified that Kirkpatrick's troubles with the police involved only traffic violations and that Kirkpatrick had returned to visit the Jones only once after his departure from their home." Mr. Jones had known Kirkpatrick was in the Mississippi State Prison at Parchman for a year and a half before January 1982, but he had not visited Kirkpatrick. Kirkpatrick had been in trouble before but for "just boylike things. I mean he got in jail a couple of times down there. The cops picked him up, give him a speeding ticket, or [sic] not wearing a helmet, things like that." Also he had stolen a van.

The court concluded that, had the state trial judge granted an overnight continuance, the Joneses would have been present at Kirkpatrick's trial the next day to offer their testimony. Their testimony, the district judge noted, was "potentially favorable to Kirkpatrick." The state offered no explanation why the state trial judge had found it so urgently necessary to begin the sentencing phase of the trial immediately. On the other hand, the trial of Kirkpatrick's co-defendant, Faulkner, set to begin on the same day as Kirkpatrick's, was continued for two months. "To paraphrase the Supreme Court," the federal district court wrote, "such 'myopic insistence upon expeditiousness in the face of a justifiable request for delay can render the right to defend [by presenting witnesses] an empty formality.' " [5]

■ The federal district court correctly noted that the grant or denial of a continuance rests in the sound discretion of the trial judge and his action may be successfully questioned only by showing an abuse of the wide decisional latitude that he is given. Relying upon decisions in which an abuse of discretion was found,[6] the federal district court concluded that the state trial court had transgressed even these broad limits.

■ The court then considered whether this trial error violated Kirkpatrick's constitutional rights. In doing so it applied the correct standard, for the writ of habeas corpus is not granted to correct every error committed by a trial court. It is allowed only for the deprivation of a constitutional right.[7] The defendant asserts, however, that the trial court's denial of a continuance violated his constitutional right to due process of law. Unless some other constitutional right incorporated into the fourteenth amendment by the due process clause is abridged, due process is violated only if the court's action denies a defendant a fundamentally fair trial.[8] The test applied to determine whether a trial error

**5.** Citing *Ungar v. Sarafite,* 376 U.S. 575, 589, 84 S.Ct. 841, 849, 11 L.Ed.2d 921, 930 (1964).

**6.** *Hicks v. Wainwright,* 633 F.2d 1146, 1150 (5th Cir.1981); *United States v. Fessel,* 531 F.2d 1275, 1281 (5th Cir.1976); *Dickerson v. Alabama,* 667 F.2d 1364, 1370 (11th Cir.), *cert. denied,* 459 U.S. 878, 103 S.Ct. 173, 74 L.Ed.2d 142 (1982).

**7.** 28 U.S.C. § 2254 (1982). *See Mabry v. Johnson,* 467 U.S. 504, ——, 104 S.Ct. 2543, 2546, 81 L.Ed.2d 437, 441 (1984).

**8.** *United States v. Bagley,* —— U.S. ——, 105 S.Ct. 3375, 3381, 87 L.Ed.2d 481, 490 (1985); *Lassiter v. Department of Social Serv. of Durham Cty.,* 452 U.S. 18, 24, 33, 101 S.Ct. 2153, 2158, 2163, 68 L.Ed.2d 640, 647, 653 (1981) (parental custody proceeding); *Skillern v. Estelle,* 720 F.2d 839, 850 (5th Cir.1983), *cert. denied,* —— U.S. ——, 105 S.Ct. 224, 83 L.Ed.2d 153 (1984); *Hicks v. Wainwright,* 633 F.2d 1146, 1148 (5th Cir.1981).

makes a trial fundamentally unfair is whether there is a reasonable probability that the verdict might have been different had the trial been properly conducted.[9]

Kirkpatrick argues that the federal district court applied the wrong analysis after it concluded that the state trial court's denial of a continuance amounted to an abuse of discretion. He contends that at that point the burden of proof should have shifted to the state to prove beyond reasonable probability that the error complained of did not contribute to his conviction, quoting the test applied by the Supreme Court in *Chapman v. California*.[10] This contention is based on an improper analysis: Kirkpatrick fails to distinguish between the standards applicable to the direct appeal of a federal conviction and those applied to applications for a writ of habeas corpus.

■ To obtain a reversal on direct appeal, a defendant need not show that the denial of a continuance denied him due process; he need show only that the denial was an abuse of discretion. In these cases, an abuse of discretion is defined as a trial error that "materially prejudice[s] the defendant." [11] Courts also describe this in-

quiry in other words with the same effect, whether the trial court's denial of a continuance prejudiced the defendant's "substantial rights," tracking the language of Federal Rule of Criminal Procedure 52(a) which provides that any error that "does not affect substantial rights shall be disregarded." [12]

■ An applicant for habeas corpus, on the other hand, must show more than prejudice to his substantial rights, because the habeas writ issues only to correct errors of constitutional magnitude.[13] The petitioner must, therefore, establish that the trial error was not merely an abuse of discretion, but was so grave as to amount to a denial of his constitutional right to substantive due process: [14] that is, that the error made the trial fundamentally unfair.[15] If the state court is found to have abridged the petitioner's constitutional rights, the more demanding review is then exacted,[16] and, as *Chapman* holds, the burden shifts to the prosecution to show that the error was harmless beyond reasonable doubt.[17]

■ The tests applied in direct appeals and in habeas cases employ the same

**9.** *See Lisenba v. California,* 314 U.S. 219, 236, 62 S.Ct. 280, 290, 86 L.Ed. 166, 179 (1941) ("In order to declare a denial of [due process guaranteed by the fourteenth amendment] we must find that the absence of [fundamental] fairness *fatally* infected the trial. . . .") (emphasis added); *see also United States v. Agurs,* 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976) (A defendant's allegation that his fifth amendment or fourteenth amendment right to due process was violated by the prosecution's violation of *Brady* shows a constitutional violation only if the omitted evidence creates a "reasonable doubt" that the verdict of guilt was correct.).

**10.** 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967).

**11.** *United States v. Miller,* 513 F.2d 791, 793 (5th Cir.1975). *See also United States v. Walker,* 621 F.2d 163, 168 (5th Cir.1980), *cert. denied,* 450 U.S. 1000, 101 S.Ct. 1707, 68 L.Ed.2d 202 (1981). *See generally United States v. Walker,* 772 F.2d 1172 (5th Cir.1985).

**12.** *United States v. Jones,* 730 F.2d 593, 596 (10th Cir.1984) ("Even if this denial [of a continuance] constituted error, it would not have been reversible absent a showing that the error was

prejudicial to the substantial rights of the defendant.").

**13.** *See supra,* note 5.

**14.** *Ungar v. Sarafite,* 376 U.S. 575, 589, 84 S.Ct. 841, 849, 11 L.Ed.2d 921, 930 (1964); *Skillern v. Estelle,* 720 F.2d 839, 850 (5th Cir.1983), *cert. denied,* — U.S. —, 105 S.Ct. 224, 83 L.Ed.2d 153 (1984); *Hicks v. Wainwright,* 633 F.2d 1146, 1148 (5th Cir.1981); *Gandy v. Alabama,* 569 F.2d 1318 (5th Cir.1978).

**15.** *United States v. Bagley,* — U.S. —, 105 S.Ct. 3375, 3381, 87 L.Ed.2d 481, 490 (1985).

**16.** *See* "Fourteenth Annual Review of Criminal Procedure: United States Supreme Court and Courts of Appeals 1983-1984," 73 Geo.L.J. 249, 774 (1984); 3A Wright, Federal Practice and Procedure: Criminal 2d § 854 at 302, § 855 at 335 (1980). *See also United States v. Phillips,* 664 F.2d 971, 1027 n. 84 (5th Cir.1981), *cert. denied,* 457 U.S. 1136, 102 S.Ct. 2965, 73 L.Ed.2d 1354 (1982); *United States v. Castillo,* 615 F.2d 878, 883-84 (9th Cir.1980).

**17.** *United States v. Ackerman,* 704 F.2d 1344, 1349-50 (5th Cir.1983).

words but they differ in two significant respects: (1) the amount of proof required for reversal, and (2) which party shoulders the burden of proof. On direct appeal, it is less difficult for a defendant to show that a trial error prejudiced his substantial rights than it is to show, in a habeas proceeding, that the error abridged his constitutional rights by rendering his trial fundamentally unfair. If, however, constitutional error is shown, the prosecution has the burden of showing that the error was harmless beyond reasonable doubt, while in direct appeals the burden of showing not only that error was made but that he suffered substantial prejudice thereby is on the defendant.

Kirkpatrick, therefore, must establish that the trial error was an abuse of discretion amounting to a denial of his constitutional right to substantive due process— that the error made his trial fundamentally unfair. Only at that point does the *Chapman* harmless error test apply. Although the *Chapman* test is applied to some violations of generic substantive due process,[18] it is by its nature incapable of application to a due process violation at the sentencing stage. Because the petitioner must show the harmfulness of the error to establish the constitutional violation, subsequent application of a second harmless-error test would be superfluous. If Kirkpatrick successfully demonstrates that he was denied due process because the trial court's failure to grant a continuance was an abuse of discretion so egregious as to render his sentencing determination fundamentally unfair, the error obviously could not then be shown to be harmless. Thus, our initial, and only, inquiry is whether the refusal denied Kirkpatrick a fundamentally fair sentencing determination.

The district court concluded that the trial was not fundamentally unfair because

there was no reasonable probability that the Jones' testimony would have changed the verdict. They were, he concluded, "bad witnesses for Kirkpatrick." They had had little communication with him since 1976, when he left their home. They had not visited him while he was serving sentences in Mississippi and Louisiana penitentiaries. Their testimony was inconsistent, and they appeared to lack concern about his future.

While Kirkpatrick did not, at the federal district court evidentiary hearing, produce the other witnesses who, he alleges, would have testified in his behalf at the sentencing phase of the trial in such a way that the verdict might have been different, he did introduce the transcript of the testimony given by his twin brother and his aunt at the state habeas corpus hearing. His twin brother, however, would not have attended Kirkpatrick's trial even if the court had granted a continuance because at that time he had been enlarged from federal custody on a bond conditioned on his not leaving Mississippi and he had been unable to get a waiver of this condition. Kirkpatrick's aunt would have testified to the deplorable conditions under which the Kirkpatrick family lived before the twins went to live with the Jones family.

█ The sentencing phase of a capital trial is literally vital. The state must give the defendant an opportunity, however vile the crime of which he has just been convicted, to demonstrate his human qualities and any circumstance that might mitigate his culpability or incline the jury to lenity.[19] Whether the denial of the right to present such evidence deprives a defendant of a constitutional right turns on the availability of such testimony. Given the district court's analysis of the Jones' testimony, which is supported by the record, the una-

---

**18.** *See, e.g., Garland v. Maggio,* 717 F.2d 199, 203 (5th Cir.1983) (*Chapman* harmless error test applied to jury instructions violative of *Sandstrom* ).

**19.** *See Eddings v. Oklahoma,* 455 U.S. 104, 110, 102 S.Ct. 869, 874, 71 L.Ed.2d 1, 8 (1982); *Lockett v. Ohio,* 438 U.S. 586, 604, 98 S.Ct. 2954,

2964, 57 L.Ed.2d 973, 989 (1978); *Woodson v. North Carolina,* 428 U.S. 280, 304–05, 96 S.Ct. 2978, 2991, 49 L.Ed.2d 944, 961 (1976). *See also Roberts (Harry) v. Louisiana,* 431 U.S. 633, 97 S.Ct. 1993, 52 L.Ed.2d 637 (1977); *Roberts (Stanislaus) v. Louisiana,* 428 U.S. 325, 96 S.Ct. 3001, 49 L.Ed.2d 974 (1976).

vailability of his brother, and the limited scope of his aunt's testimony, we are unable to say that Kirkpatrick has proved that there was a reasonable probability that the granting of a continuance would have permitted him to adduce evidence that would have altered the verdict and hence he has failed to establish that his sentencing hearing was fundamentally unfair.

### III.

Kirkpatrick contends that in the closing arguments made by the prosecutor at both the guilt-innocence and sentencing phases of the trial, the prosecutor made irrelevant and inflammatory statements calculated to appeal to the jury's prejudice. Specifically, Kirkpatrick complains that the prosecutor, in arguing for a verdict of guilty, referred falsely to past lives Kirkpatrick allegedly took and wrongly referred to the personal character of the victim. Kirkpatrick also complains that later, in arguing for capital punishment, the district attorney improperly discussed the law of the defense of others, improperly exhorted the jury to fight crime by sentencing Kirkpatrick to death, and prejudicially compared the rights of the defendant to the putative rights of the victim. Kirkpatrick argues that improper jury argument by the prosecutor so infected the trial with unfairness as to render his conviction a denial of due process.

■■ In habeas corpus proceedings, federal appellate courts do not employ the broad supervisory power that they exercise over the federal trial courts.[20] Accordingly, federal courts may not, in a habeas corpus proceeding, impose the same standards upon state prosecutors that they apply to federal prosecutors in cases on direct appeal.[21] The prosecutor's remarks do not present a claim of constitutional significance unless they were so prejudicial that Kirkpatrick's state court trial was rendered fundamentally unfair within the meaning of the fourteenth amendment.[22] There is such unfairness only if the prosecutor's remarks evince "either persistent and pronounced misconduct or ... the evidence was so insubstantial that (in probability) but for the remarks no conviction would have occurred."[23] When thus attacked, prosecutorial comments are not considered in isolation, but are evaluated in the context of the entire trial as a whole including the prosecutor's entire closing argument.[24]

### A. STATEMENTS DURING GUILT PHASE

■■ Kirkpatrick singles out as an egregious example of the prosecutor's misconduct a statement the prosecutor allegedly made in arguing for a conviction of guilt. The transcript of the prosecutor's closing argument at the guilt phase of the trial contains the following paragraph:

What you have to do, if you want to acquit, if you want to acquit Freddie Kirkpatrick, you've got to say 'I believe everything he said today.' And even though some of it doesn't make sense and even though some of it is impossible, give him the benefit and let him go. And forget about Mr. Radosti [*sic*] and forget about all of the other witnesses and *forget about the past lives* that Kirkpatrick has took.[25]

The state contends that the prosecutor did not refer to "past lives that Kirkpatrick has took" but to "past lies that Kirkpatrick has told" and that the transcript is in error. No proceedings to correct the record have been taken, however, as Louisiana decision-

---

**20.** *Donnelly v. DeChristoforo*, 416 U.S. 637, 642–43, 94 S.Ct. 1868, 1871, 40 L.Ed.2d 431, 436 (1974).

**21.** *Whittington v. Estelle*, 704 F.2d 1418, 1422 (5th Cir.), *cert. denied*, 464 U.S. 983, 104 S.Ct. 428, 78 L.Ed.2d 361 (1983).

**22.** *Whittington v. Estelle*, 704 F.2d at 1421; *Houston v. Estelle*, 569 F.2d 372, 378 n. 8 (5th Cir.1978).

**23.** *Fulford v. Maggio*, 692 F.2d 354, 359 (5th Cir.1982), *rev'd on other grounds*, 462 U.S. 111, 103 S.Ct. 2261, 76 L.Ed.2d 794 (1983).

**24.** *Cobb v. Wainwright*, 609 F.2d 754, 755 n. 1 (5th Cir.), *cert. denied*, 447 U.S. 907, 100 S.Ct. 2991, 64 L.Ed.2d 857 (1980).

**25.** Emphasis added.

al law apparently permits.[26] In federal proceedings, the transcript is "deemed prima facie a correct statement of the testimony taken and proceedings had," [27] but the record may be corrected upon proof that the transcript is incorrect.[28] Such a correction should presumably be made by the trial judge.[29]

The issue of the correctness of the transcript was not raised during Kirkpatrick's appeal for the contention was not then made that the prosecutor's remark was inflammatory. Hence, no motion to correct the state trial transcript was made. While Louisiana has a procedure for correction of transcript error while an appeal is pending, its Code of Criminal Procedure contains no provision for such a correction after a judgment has become final, and Louisiana courts have never considered whether the record might then be changed.

The transcript, however, does not become gospel once the conviction is final. If it is in error, it should be correctible by a procedure analogous to that prescribed for earlier convictions, that is, by a motion to correct, addressed to the trial court. Here no motion was filed, but the issue of the correctness of the transcript was fully considered during the state habeas corpus hearing by the judge who had conducted the state trial. Because both parties were fully aware of the issue and evidence was adduced, the state court post-conviction proceedings appear to us to be sufficiently reliable to warrant our reliance on them.

At the state post-conviction hearing, the defense attorney testified that he did not remember that the words quoted in the transcript had been used. The state judge in his opinion said he "did not hear such a statement as this." He continued:

Had this statement been made, I am convinced that I would have come from my chair, [defense counsel] from his, and [co-counsel for defendant] present would have had a conniption fit.

[The prosecuting attorney] is too experienced, too trained, too skilled and too intelligent to have made such a statement. This statement alone would have resulted in a mistrial. Further, [his] English albeit only some better than mine is considerably better than that as noted by the reporter.

This Court is convinced that instead of saying "Forget about the past lives that Kirkpatrick has took," what [the prosecuting attorney] said was "Forget about the past lies," l-i-e-s, "that Kirkpatrick has told."

 This finding is supported by the context in which the words were used and the earlier part of the prosecutor's argument in which he emphasized a number of alleged lies told by Kirkpatrick. While comment on other homicides not in evidence would indeed have been grossly improper, the finding that such a statement was not in fact uttered, made by the judge who had conducted the trial, should be considered a correction of the transcript. Thus corrected, the statement was not improper.

 Kirkpatrick also complains that the state prosecutor improperly referred to the character of the victim, Mr. Radoste, during his argument in the guilt stage of the trial. There were two references. The following was the most severe:

I prefer to think that here's a man who apparently had been responsible all of his life. Here's a man that apparently has never hurt anybody. Here's a man that helped raise sisters. Here's a man that works, that takes care of his property, that apparently is concerned about other people, apparently a gentleman, apparently a kind man.

26. *See, e.g., State v. Domingue,* 298 So.2d 723 (La.1974).

27. 28 U.S.C. § 753(b) (1982).

28. *United States v. Smith,* 433 F.2d 149 (5th Cir.1970); *United States v. Carter,* 347 F.2d 220 (2d Cir.), *cert. denied,* 382 U.S. 888, 86 S.Ct. 178, 15 L.Ed.2d 124 (1965).

29. *United States v. Smith,* 433 F.2d at 151; 8 Federal Procedure, L.Ed. § 20:183, at 305 (1982).

These comments were made by the prosecutor in an effort to refute Kirkpatrick's contention that he acted to fend off Radoste's homosexual advances, supposedly made at gunpoint. Considering the nature of the defense, we do not think that the prosecutor's remarks were intended to evoke the jury's sympathy. Nor were they excessive. They were, instead, a measured response to an asserted line of defense. While we recognize that references to the victim's character may be improper,[30] we do not find the argument made here to be unfair.

## B. SENTENCING PHASE

In his closing argument at the sentencing phase of the trial, the prosecutor argued:

> Under Louisiana law, if any one of us would have been fortunate enough, or unfortunate enough as it might have turned out, to have walked up on that scene just before Mr. Radoste died, we would have had every legal right in the world to blow those people away, to kill them both on the spot.... But now, you see, they want to make you feel guilty when, in accordance with the legal process, you're called upon to decide what punishment fits the crime. You have no reason to feel guilty.

Kirkpatrick argues that the prosecutor thus impermissibly focused the jury's attention on the law of defense of others as the basis for giving the death penalty, instead of the aggravating and mitigating circumstances in the case, which is the constitutionally required basis.

In addition the prosecutor ended his argument with an invocation of duty to the victims of crime:

> Let your mind think about your obligation to other Mr. Radoste's, to other victims of crime. Let your mind think about how you cope with the Freddie Kirkpatrick's of the world, because you have to give that some hard thought. You have to give it hard thought. And we have a right to be protected.

This theme was repeated in slightly different expression:

> And it always sort of bothers me in a way and it always comes to my mind in these situations that we're—you know, poor old Mr. Radoste didn't have nobody there to argue for him. He didn't have a trial. He didn't have twelve citizens called in to sit in that living room and decide whether Freddie and Charles could do what they wanted to with him. He didn't have a lawyer, you know. He didn't have an appeal. Freddie Kirkpatrick did it all. And yet, our system is, we're in here worrying about and arguing over Freddie Kirkpatrick.

The federal district court did not discuss the propriety of these statements. Instead, it said that the record did "not demonstrate either persistent or pronounced misconduct. Moreover, the evidence supporting Kirkpatrick's conviction is not insubstantial. The record demonstrates that Kirkpatrick received a fair and constitutional trial; there is no doubt of his guilt.... In light of the evidence against him, the statements complained of do not rise to the level of a denial of a fundamentally fair trial."[31]

This court has held comments of each type not so inflammatory as to constitute denial of a fair trial. We first consider the statements about the defense of others. In *Willie v. Maggio*,[32] an application for federal habeas relief, the Fifth Circuit considered an identical prosecutorial argument. The court found this argument improper because it "misstates the law regarding Louisiana's scheme of capital punishment, which does not allow the jury to impose the death penalty simply because lethal force could have been used in de-

---

**30.** *Vela v. Estelle,* 708 F.2d 954, 956 (5th Cir. 1983), *cert. denied,* 464 U.S. 1053, 104 S.Ct. 736, 79 L.Ed.2d 195 (1984).

**31.** *Citing Higgins v. Wainwright,* 424 F.2d 177, 178 (5th Cir.), *cert. denied,* 400 U.S. 905, 91 S.Ct. 145, 27 L.Ed.2d 142 (1970).

**32.** 737 F.2d 1372 (5th Cir.1984).

fense of the victim."[33] However, the court found that the prosecutor's remarks did not render the sentencing part of the trial fundamentally unfair. It viewed the arguments and evidence as a whole and concluded that the jury's recommendation of death was not influenced by the improper comments: the jury had found two aggravating factors[34] and there was little mitigating evidence.

■ While the prosecutor's argument was improper because it distracted the jury from its proper concern—the aggravating and mitigating factors mandated by Louisiana's capital punishment scheme—it was not so prejudicial as to render the trial fundamentally unfair. As in *Willie,* the jury found two aggravating factors at the sentencing phase of Kirkpatrick's trial.[35] As the federal district court observed, the evidence of Kirkpatrick's guilt was far from insubstantial.

■ Kirkpatrick next complains of the prosecutor's invocation of the jury's duty. He argues that this remark could serve only to arouse the passions of the jurors and persuade them to vote for the death penalty for improper reasons. However, the prosecutor's remarks, akin to a "war on crime" argument, were less egregious than similar arguments that we have found proper. In *United States v. Caballero,*[36] the court held the prosecutor's closing argument, in which he requested the jury to "have the courage to go out there and find these Defendants guilty," to be a permissible plea for law enforcement. In the recent Eleventh Circuit decision, *Brooks v. Kemp,*[37] the majority found the following argument proper as an argument for deterrence:

> You can bring back the death penalty and you can tell William Brooks, and you can tell every other criminal like him, that if you come to Columbus and Muskogee County, and you commit a crime, and it's one of those crimes that's punishable by death, and if the aggravating

circumstances are there, you're going to get the electric chair. . . .

The prosecutor's comments at Kirkpatrick's trial are no more egregious.

The prosecutor also impliedly condemned Kirkpatrick's invocation of the legal process. Kirkpatrick contends that this argument infringed on his right to counsel, his right to trial by jury, and his right to an automatic direct appeal from a sentence of death.

In the recent case of *Caldwell v. Mississippi,*[38] the Supreme Court considered a prosecutor's argument at the sentencing stage of a bifurcated capital case that led the jury to believe that responsibility for determining the appropriateness of the death sentence lay elsewhere. The Court held that this argument rendered the sentencing hearing fundamentally unfair. In *Caldwell,* however, the prosecutor argued to the jury that, if it were to return a sentence of death, the decision would automatically be reviewed by the Supreme Court. This was a calculated response by the prosecutor to the closing argument of defense counsel; it was an effort to "minimize the jury's sense of importance of its role."[39] This case is not controlled by *Caldwell.* In arguing that Kirkpatrick be sentenced to death, the state prosecutor's comments were not designed to shift the burden of decision from the jury.

■ We recognize that it is improper for a prosecutor "to urge that a criminal defendant's exercise of constitutional rights is a ground for discrediting his defense," and to imply "that the system coddles criminals by providing them with more procedural protections than their victims."[40] However, we view the prosecutor's remarks in this case as an attempt to illustrate for the jury the defendant's total disregard of the rights of the victim, rather than an attempt to discredit Kirkpatrick for his decision to put the state to its proof. Even if the argument was inappropriate, it did not make the sentencing hearing un-

---

33. *Id.* at 1390.

34. *See* La.Code Crim.P. art. 905.4 (West 1984).

35. *See supra,* text accompanying note 3.

36. 712 F.2d 126 (5th Cir.1983).

37. 762 F.2d 1383 (11th Cir.1985).

38. —— U.S. ——, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985).

39. *Id.* at ——, 105 S.Ct. at 2637, 86 L.Ed.2d at 236.

40. *Brooks v. Kemp,* 762 F.2d 1383, 1411 (11th Cir.1985) (en banc). *See also Bruno v. Rushen,* 721 F.2d 1193, 1195 (9th Cir.1983), *cert. denied,* —— U.S. ——, 105 S.Ct. 302, 83 L.Ed.2d 236 (1984).

fair. Finally, when viewed as a whole, each of the closing arguments was not improper.

## IV.

Kirkpatrick contends his counsel were ineffective. He alleges numerous grounds in support of his contention, arguing that competent counsel would have taken another course. These include their failure to (1) seek suppression of the evidence the police obtained in their search of Kirkpatrick's residence in Mississippi on the ground that the warrants for his arrest for arson, and later for murder, were facially invalid; (2) object to allegedly improper prosecutorial statements; (3) investigate and interview witnesses prior to trial; (4) move to suppress oral inculpatory statements; (5) conduct adequate voir dire examination of the talesmen, including failure to rehabilitate those talesmen excluded for cause because of their attitude toward the death penalty; (6) prepare Kirkpatrick before he testified at trial; (7) object to improper jury instructions; and (8) file a meaningful brief on direct appeal to the Louisiana Supreme Court. Many of these form the basis of other independent claims for relief. Kirkpatrick also contends that the workload of Thomas Ford, the principal defense counsel, as a public defender was so excessive as to render his assistance per se ineffective.

While an evidentiary hearing was held on these contentions in the state post-conviction proceeding, the federal district court correctly concluded that the state judge had failed to make any express findings of historical fact and that it was obliged to make an independent evaluation of the record. The district court then said, "Because I have read and considered the entire record of Kirkpatrick's trial, it is not necessary for me to review Kirkpatrick's allegations of ineffective assistance individually."[41] The federal district judge then concluded, "The evidence supporting Kirkpatrick's conviction and sentence is substantial."

In *Strickland v. Washington*[42] the Supreme Court announced the standard for determining when counsel in a state criminal trial has been so ineffective as to warrant federal relief. To succeed on a claim of ineffective assistance of counsel a defendant must demonstrate both that his counsel's performance was deficient and that the error so prejudiced his defense as to deny him a fair trial.[43] If proof of one element is lacking, the court need not examine the other.[44]

To satisfy the first prong of *Strickland*'s test, a defendant must demonstrate that his counsel made errors so serious that he did not function as the "effective counsel" guaranteed by the sixth amendment.[45] "The proper measure of attorney performance remains simply reasonableness under prevailing professional norms."[46] There is a strong presumption that defense counsel rendered effective assistance and that his conduct fell within the range of reasonable professional assistance,[47] for in any given case there are countless ways to provide effective assistance.[48] The court must determine whether, in the light of all the circumstances, the identified acts or omissions are outside the wide range of professionally competent assistance.[49] The court must recognize, however, that the "reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions."[50]

---

**41.** The federal district judge cited *Fulford v. Maggio,* 692 F.2d 354, 359 (5th Cir.1982), *rev'd on other grounds,* 462 U.S. 111, 103 S.Ct. 2261, 76 L.Ed.2d 794 (1983).

**42.** 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

**43.** *Id.* at ——, 104 S.Ct. at 2064, 80 L.Ed.2d at 692.

**44.** *Id.* at ——, 104 S.Ct. at 2069–70, 80 L.Ed.2d at 699; *Willie v. Maggio,* 737 F.2d 1372, 1392 (5th Cir.1984).

**45.** 466 U.S. at ——, 104 S.Ct. at 2064, 80 L.Ed.2d at 692. *See also McMann v. Richardson,* 397

U.S. 759, 771 n. 14, 90 S.Ct. 1441, 1449 n. 14, 25 L.Ed.2d 763, 773 n. 14 (1970) (the right to counsel is the right to effective assistance of counsel).

**46.** *Strickland,* 466 U.S. at ——, 104 S.Ct. at 2065, 80 L.Ed.2d at 694.

**47.** *Id.* at ——, 104 S.Ct. at 2066, 80 L.Ed.2d at 695.

**48.** *Id.*

**49.** *Id.*

**50.** *Id.*

■ Even if the defendant successfully shows an error or deficient performance by counsel, he also must show that counsel's error was prejudicial to the defense. The standard by which prejudice is proved is high; the defendant has the burden of showing "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." [51]

■ The district court's conclusory review of the record pretermits the contention that we view as serious: whether the evidence obtained in the search of Kirkpatrick's residence, which established his complicity at least in robbery, would have been admitted had counsel moved to suppress it, and, if so, the effect of exclusion of that evidence. While the district court received no assistance from the state by brief or pleading, it carefully reviewed each of the twenty-four alleged constitutional violations raised by Kirkpatrick. Nevertheless, we do not think it appropriate for us to make the factual determination whether Kirkpatrick's counsel was deficient or whether Kirkpatrick was thereby prejudiced. Accordingly, we remand for these determinations, to be made conformably with *Washington v. Strickland.* The district court may hold an evidentiary hearing or, if the record is sufficient, may make findings solely on the evidence already adduced.

## V.

■ In *Enmund v. Florida,* [52] the Supreme Court held that the eighth amendment proscribes a death sentence for accomplice liability in felony murders, stating that capital punishment may be imposed only on one who himself kills, attempts to kill, or intends that a killing take place or that lethal force will be employed. We have interpreted *Enmund* to require proof that "the defendant either participated directly in the killing or personally had an intent to commit murder." [53] Thus, we have held that a defendant may not be sentenced to death for participation in a felony in the course of which murder was committed by another felon. [54] Before a state may impose the uniquely severe and irrevocable sentence of death, it must "focus on the personal intent and culpability of the defendant himself, and not merely that of an accomplice." [55]

■ The Louisiana trial court charged the jury on the law of principals as follows:

All persons concerned in the commission of a crime, whether present or absent, and whether they directly commit the act constituting the crime, aid and abet in its commission, or directly or indirectly counsel or procure another to commit the crime, are principals and are guilty of the crime charged.

The court was clearly entitled to give this charge with respect to the offenses of armed and simple robbery [56]—the enumerated felonies that the state argued Kirkpatrick committed during his murder of Radoste, thus supporting its allegation of first degree murder. [57] The court did not, however, permit the jury to find Kirkpatrick guilty of first degree murder solely because of his participation in the robbery or any vicarious guilt. It then properly charged the jury on the requirements for finding Kirkpatrick guilty of first degree murder:

In order to convict the defendant of first degree murder, you must find, one, that the defendant killed or was a principal in the killing of Steven Radoste; *and, two, that the defendant acted with a specific intent to kill or inflict great bodily harm;* and, three, that the defendant was engaged in or was a principal in the commission or attempted commission of

51. *Id.* at ——, 104 S.Ct. at 2068, 80 L.Ed.2d at 698.

52. 458 U.S. 782, 797, 102 S.Ct. 3368, 3376, 73 L.Ed.2d 1140, 1151 (1982).

53. *Reddix v. Thigpen,* 728 F.2d 705, 708 (5th Cir.), *cert. denied,* —— U.S. ——, 105 S.Ct. 397, 83 L.Ed.2d 331 (1984).

54. *Id.*

55. *Reddix v. Thigpen,* 728 F.2d at 708. *See also Jones v. Thigpen,* 741 F.2d 805 (5th Cir.1984); *Bullock v. Lucas,* 743 F.2d 244, 247 (5th Cir. 1984), *cert. granted sub nom., Cabana v. Bullock,* —— U.S. ——, 105 S.Ct. 2110, 85 L.Ed.2d 476 (1985).

56. La.Rev.Stat.Ann. § 14:24 (West 1974). *See also State v. Watson,* 397 So.2d 1337, 1342 n. 10 (La.), *cert. denied,* 454 U.S. 903, 102 S.Ct. 410, 70 L.Ed.2d 222 (1981).

57. *See* La.Rev.Stat.Ann. § 14:30 (West Supp. 1985).

armed robbery or simple robbery. (Emphasis added.)

Kirkpatrick contends that the jury instructions did not meet the *Enmund* test. The error charged is that the jury might have found Kirkpatrick guilty even if he intended only to inflict great bodily harm on Radoste. Who killed Radoste and whether Kirkpatrick had the intention of killing him were contested issues. As the Louisiana Supreme Court found "there [was] no conclusive evidence as to who actually shot Mr. Radoste." [58] Kirkpatrick testified that he did, however, strike Radoste over the head and then stab him twice.

Similar issues have been raised in three cases that we have considered. *Reddix v. Thigpen* [59] involved the habeas application of a prisoner convicted under Mississippi's capital murder statute. The defendant, Reddix, had attracted the attention of the victim while an accomplice "slipped up behind him and, as Reddix watched, brutally hit him over the head three or four times with a Stilson wrench, crushing his skull." The two had then robbed the victim's store. The court charged the jury that it might find Reddix guilty of capital murder if it found that the killing was "done with any design to effect death by *any person* engaged in the crime of robbery." We upheld Reddix's conviction of capital murder, reasoning that *Enmund* did not affect the state's definition of any substantive offense, and thus Mississippi was free to convict a defendant of capital murder if a murder was committed by any co-defendant during the course of an enumerated felony. [60] We concluded, however, that Mississippi could not sentence such a defendant to death absent the specific intent from *Enmund*. Because "[a] reasonable juror carefully heeding [the court's] instructions fairly could conclude that [the accomplice's] intent to commit murder may be imputed to

Reddix," [61] we, therefore, reversed Reddix's death sentence. In *Bullock v. Lucas*, [62] we followed *Reddix.*

In *Clark v. Louisiana State Penitentiary*, [63] a Louisiana prisoner sought a writ of habeas corpus alleging that he had been sentenced to death in violation of *Enmund*. Louisiana's first degree murder statute requires the state to prove the defendant's specific intent to kill or inflict great bodily injury. [64] Because the trial court's instructions permitted the jury to "attribute the murderous act of one conspirator to the other," [65] we reversed Clark's conviction.

In none of these cases, therefore, did we consider whether the jury must be instructed, before it imposes the death sentence, that the intentional use of lethal force is essential or that the deliberate infliction of great bodily harm that results in death is insufficient for the imposition of the supreme penalty.

 Neither *Enmund* nor our three decisions interpreting it makes the use of the words "lethal force" talismanic. *Enmund*'s teaching is that a person may not be sentenced to death for the death-dealing act of another unless he shares culpability for the homicide. The words "lethal force" as employed in *Enmund* make it clear, however, that the defendant will not be absolved if he contemplates "that lethal force will be employed by others." [66] While the death penalty may not "be imposed for vicarious felony murder ...," [67] it may be imposed on one who knowingly participates in a course of action that contemplates the use of lethal force, even if one is not the triggerman. Imposition of the death penalty, *Enmund* instructs, depends "on the degree of [the defendant's] culpability—what [his] intentions, expectations, and actions were." [68]

 When the defendant himself acts with the intention of inflicting great bodily

---

**58.** *State v. Kirkpatrick,* 443 So.2d 546, 552 (La. 1983).

**59.** 728 F.2d 705, 707 (5th Cir.), *cert. denied,* —— U.S. ——, 105 S.Ct. 397, 83 L.Ed.2d 331 (1984).

**60.** *Id.* at 708–09.

**61.** *Id.* at 709.

**62.** 743 F.2d 244 (5th Cir.1984), *cert. granted sub nom., Cabana v. Bullock,* —— U.S. ——, 105 S.Ct. 2110, 85 L.Ed.2d 476 (1985).

**63.** 694 F.2d 75 (5th Cir.1982).

**64.** La.Rev.Stat.Ann. § 14:30 (West Supp.1985).

**65.** *Clark,* 694 F.2d at 76.

**66.** *Enmund,* 458 U.S. at 799, 102 S.Ct. at 3377, 73 L.Ed.2d at 1152.

**67.** *Id.*

**68.** *Id.* at 800, 102 S.Ct. at 3378, 73 L.Ed.2d at 1153.

harm *and* either killed the victim or was a principal in his killing *and* was engaged in or was a principal in the commission of robbery, he has acted with personal culpability. Indeed lethal force might be employed without the intention of inflicting great bodily harm, for example, by the use of a firearm to shoot at the victim without intending to cause his death or serious injury. When a defendant personally intends to inflict great bodily harm and succeeds in producing death, his personal involvement and individual culpability is sufficiently established that the capital sentence is not cruel and unusual.

■■■ Kirkpatrick testified that, after striking the victim over the head, he stabbed Radoste twice. The knife used in the assault was buried to the hilt in the victim's chest and the victim had severe abdominal wounds. Both wounds were potentially lethal. The gunshot was but the coup de grace and Kirkpatrick cannot be exonerated even if he did not pull the pistol trigger. We conclude not only that the charge was proper but that the evidence was sufficient to warrant conviction.

For these reasons, the judgment of the district court is AFFIRMED insofar as it denies relief on all of the grounds asserted except the alleged ineffectiveness of counsel, particularly in failing to seek suppression of the evidence seized in Mississippi. We VACATE the judgment denying relief and REMAND for further proceedings on that issue consistent with this opinion.

ALVIN B. RUBIN, Circuit Judge, dissenting in part.

I respectfully dissent from Part IIIB of the opinion, which holds that the prosecutor's remarks at the sentencing hearing did not deny Kirkpatrick due process when he was sentenced to death. Even if any one of the prosecutor's comments was not egregious, the cumulative effect of his arguments was sufficient to deprive the accused of the rational sentencing proceeding to which due process entitled him.

Because death is so fundamentally different from other kinds of punishment, the Constitution requires, by means of procedural safeguards and judicial vigilance, assurance that the imposition of death is not the product of arbitrariness or caprice.[1] At a sentencing hearing in a capital case, the jury's role is to focus on the aggravating and mitigating circumstances of the crime. In reviewing such a proceeding, we inquire whether the jury was motivated by subjective rather than objective factors in reaching its decision. If the prosecutor's arguments make a rational assessment by the jury unlikely, or the prosecutor engages in "persistent or pronounced misconduct,"[2] then the sentencing hearing is fundamentally unfair.

As the majority opinion notes, while each of the three arguments was improper, we have, in other cases, held each of them, standing alone, not so pernicious as to deny the accused due process. In this case the prosecutor sought to arouse the jury not once, but three times, and we should consider them in the context of the entire proceeding.[3] The district attorney's argument covered only four pages of the transcript, and, therefore, likely took less than five minutes. In so short a span, he made three wrongful appeals to the jurors' emotions. While each by itself may not have awakened the jurors' prejudices, together they were capable of doing so, for they directed attention to matters irrelevant to the determination of the aggravating circumstances that alone warranted imposition of the death penalty.

"Louisiana's scheme of capital punishment ... does not allow the jury to impose the death penalty simply because lethal force could have been used in defense of the victim,"[4] and we have, therefore, held a prosecutor's invocation of the right to defend others grossly improper,[5] for it diverts the jurors from their proper concern—the aggravating and mitigating circumstances of the crime.[6]

The district attorney also exhorted the jury to join the fight on crime. Jurors are neither warriors nor policemen. They are judges, judges of the facts. It is their task

**1.** *See, e.g., Zant v. Stevens,* 456 U.S. 410, 413, 102 S.Ct. 1856, 1857, 72 L.Ed.2d 222, 225 (1982).

**2.** *Fulford v. Maggio,* 692 F.2d 354, 359 (5th Cir. 1982), *rev'd on other grounds,* 462 U.S. 111, 103 S.Ct. 2261, 76 L.Ed.2d 794 (1983).

**3.** *See Cobb v. Wainwright,* 609 F.2d 754, 755 n. 1 (5th Cir.), *cert. denied,* 447 U.S. 907, 100 S.Ct. 2991, 64 L.Ed.2d 857 (1980) (instances of prosecutorial argument are not to be viewed in isolation).

**4.** *Willie v. Maggio,* 737 F.2d 1372, 1390 (5th Cir.1984).

**5.** *Id.*

**6.** *See* majority opinion, *supra,* text following note 34.

to decide, not to ferret out evil. As Judge Frank Johnson has observed, an argument that enlists the jurors in a cause is notoriously inflammatory:

> Not only does the characterization of the defendant as an anonymous member of the "criminal element" deprive him of the individualized consideration required prior to the imposition of the death penalty, but the suggestion that a "war" has been declared, and the attendant implication that jurors have a "duty" to fight it, removes from the jury the sense of responsibility for their decision that makes for an appropriately bounded exercise of their discretion.[7]

The prosecutor's third error, his implied condemnation of Kirkpatrick's invocation of the legal process is equally egregious.[8] The popular media have inflamed public opinion with resentment, if not rage, at the protection accorded the accused while, to assert a popular view, there is less (or no) concern for the rights of the victim. To invoke prejudice against the accused because he is entitled to due process of law before being condemned is to strike at the fundamental due process protections accorded by the fourteenth amendment.

The cumulative effect of the district attorney's comments fatally infected the sentencing hearing and rendered it fundamentally unfair. They injected improper considerations into the jury's deliberations, undermining the jurors' ability to weigh dispassionately the aggravating and mitigating factors of the case and to reach a rational determination. Accordingly, I would remand for a proper sentencing hearing.

### ON SUGGESTION FOR REHEARING EN BANC

### OPINION

**PER CURIAM:**

Kirkpatrick's petition for rehearing argues that we applied an improper standard of review to the alleged constitutional errors in his state court trial. The application relies on three Supreme Court decisions, all referred to in our original opinion,

but our decision is fully consistent with each of them.

*Lockett v. Ohio*[1] held an Ohio death penalty statute unconstitutional because it allowed consideration of only three enumerated mitigating circumstances and thus did not permit the full individualized consideration of mitigating factors required by the Eighth and Fourteenth Amendments. *Eddings v. Oklahoma*[2] vacated a death sentence imposed on a person who was sixteen years old at the time of the crime because the trial court had refused to consider evidence of the youth's troubled past when offered to mitigate the sentence. The Court held that all relevant mitigating evidence must be considered.

The trial court's refusal to grant a continuance was equivalent neither to the exclusion of mitigating evidence nor to the limitation of such evidence to specific factors. Mitigating evidence was in fact presented. If the denial of a continuance violated any of Kirkpatrick's constitutional rights, it was his right to due process, not his right to be free from cruel and inhuman punishment.

Similarly, Kirkpatrick seeks to persuade us to apply to our review of the prosecutor's remarks the standards exacted by the Eighth Amendment rather than the less stringent due process criteria, citing as authority *Caldwell v. Mississippi.*[3] As we explained in our panel opinion, *Caldwell* held that "it is constitutionally impermissible to rest a death sentence on a determination made by a sentencer who has been led to believe that the responsibility for determining the appropriateness of the defendant's death rests elsewhere."[4] It does not follow that every other improper remark by a prosecutor at the sentencing phase of a capital case is per se so prejudicial as to be weighed against the same balance.

The concluding paragraph of the majority opinion in *Caldwell* states,

> In this case, the State sought to minimize the jury's sense of responsibility for determining the appropriateness of death. Because we cannot say that *this effort* had no effect on the sentencing decision, that decision does not meet the standard

---

**7.** *Brooks v. Kemp,* 762 F.2d 1383, 1430 (11th Cir.1985) (Johnson, J., dissenting).

**8.** *See, e.g., Bruno v. Rushen,* 721 F.2d 1193 (9th Cir.1983), *cert. denied,* — U.S. —, 105 S.Ct. 302, 83 L.Ed.2d 236 (1984).

**1.** 438 U.S. 586, 98 S.Ct. 2953, 57 L.Ed.2d 973 (1978).

**2.** 455 U.S. 104, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982).

**3.** 105 S.Ct. 2633 (1985).

**4.** *Id.* at 2639.

of reliability that the Eighth Amendment requires.[5]

In our opinion the "no effect" test applies to the state's effort to minimize the jury's sense of responsibility, not to every other improper argument.

Finally, we emphasize as we did in our original opinion that "when viewed as a whole, each of the closing arguments was not improper." It is on this final conclusion that we ultimately rest.

No member of the panel nor Judge in regular active service of this Court having requested that the Court be polled on rehearing en banc (Federal Rules of Appellate Procedure and Local Rule 35), the suggestion for Rehearing En Banc is DENIED.

For these reasons the application for rehearing by the panel is DENIED. Judge Rubin adheres to his original dissent.

---

**5.** 105 S.Ct. at 2645 (emphasis supplied).